## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 11 2018, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of L.R. and C.R. (Minor Children), Children in Need of Services, | April 11, 2018 |
| | Court of Appeals Case No. 49A05-1711-JC-2706 |
| M.R. (Mother) and R.R. (Father), | Appeal from the Marion Superior Court |
| *Appellant-Respondent,* | |
| v. | The Honorable Marilyn A. Moores, Judge |
| | The Honorable Diana J. Burleson, Magistrate |
| Indiana Department of Child Services, | Trial Court Cause No. 49D09-1708-JC-2629 49D09-1708-JC-2630 |
| *Appellee-Petitioner.* | |

**Najam, Judge.**

## Statement of the Case

M.R. ("Mother") appeals the trial court's adjudication of two of her minor children, L.R. and C.R., as children in need of services ("CHINS"). Mother raises one issue for our review, namely, whether the trial court erred when it adjudicated L.R. and C.R. to be CHINS.[1]

We affirm.

## Facts and Procedural History

Mother has three children: A.M., born September 18, 2008; L.R., born August 13, 2014; and C.R., born August 7, 2016, ("the Children"). On August 9, 2017, Officer Nickolas Smith with the Indianapolis Metropolitan Police Department arrested a "small[-]time dealer" at Mother's house due to an incident "over [Mother] not paying him for . . . marijuana." Tr. Vol. II at 97. On August 10, Heather Pulford, a Family Case Manager ("FCM") with the Indiana Department of Child Services ("DCS"), went to Mother's house to investigate the safety and well-being of the Children based on allegations that drugs were being used in and sold from the house while the Children were present. When FCM Pulford arrived, Mother initially told her that the Children were not home, but Mother eventually let her see the Children.

---

[1] R.R., L.R.'s father and a named respondent below, does not participate in this appeal.

[4] When FCM Pulford observed the Children, she noticed that C.R. had a black eye with bruising that was both above and below his eye and that "went over to the side of his cheek." *Id*. at 106. She also observed that C.R. had bruising on his side. FCM Pulford noticed that L.R. had red marks on her body, which seemed to be bug bites, and that L.R. also had a bruise on her side.

[5] Victoria Anderson, a DCS Collector with Jones Laboratory, also went to Mother's house that day to obtain a urine sample from Mother in order to perform a drug test. Anderson accompanied Mother into the restroom. In the restroom, Anderson saw a pill bottle that she believed to be full of urine. She further believed that Mother was attempting to "[p]ossibly fill up the test cup" with the urine from the pill bottle. *Id*. at 91. Once Anderson observed the suspicious behavior, she terminated the test. Anderson was not able to get a sample from Mother that day.

[6] Officer Smith returned to Mother's house on August 10 in order to assist DCS. When Officer Smith arrived, he entered the house to speak with Mother. Once inside the house, Officer Smith noticed that a large dog was on the bed in one of the bedrooms and decided to close the door to that room since he did not know if the dog was aggressive. When he went to close the bedroom door, Officer Smith saw "a clear plastic tube with a baggie of pills bundled up and some black rock like substance" that he believed to be heroin "in an open drawer of the bedside table." Ex. at 42.

[7] After Officer Smith observed the substance that he believed to be heroin, he arrested Mother.[2] Officer Smith then "asked [Mother] what was in the bedroom and she stated it was heroin[]." Tr. Vol. II at 94. Mother also told Officer Smith that the room where he had found the heroin was her bedroom, but Mother told Officer Smith that the heroin and the pills belonged to David Woods, who was also at Mother's house. Officer Smith arrested Woods. Woods claimed that the heroin belonged to him.

[8] After Anderson terminated the drug test, Mother got upset and asked everyone to leave her house. As everyone was leaving, FCM Pulford saw officers search Woods on the front porch of the house, and she saw a syringe fall out of Woods' pocket. Based on the fact that Mother had initially tried to hide the Children, that Mother did not complete a drug screen, and that she had witnessed a syringe fall out of Woods' pocket while he was in the house where the Children lived, FCM Pulford removed the Children from the home. On August 14, 2017, DCS filed a petition alleging that the Children were CHINS.

[9] After DCS filed the CHINS petition, Mother visited with the Children. Renee Lester, a visitation facilitator, supervised the visit. Lester noted that "Mother was not appropriate" during that visit, that Mother had used profanity throughout the entire visit, and that Mother had told the Children to not talk to police officers or DCS because they are "horrible people." *Id*. at 120. At some

---

[2] Mother was released on her own recognizance and no charges were filed against her.

point, FCM Kemamee Fatormah spoke with Mother. Mother admitted to FCM Fatormah that she is a drug addict and that she "knows she messed up" and "want[ed] help[.]" *Id.* at 125. Mother requested services, so FCM Fatormah made referrals for: a substance abuse assessment; "Redwood";[3] home based case management through Seeds of Life; visitation with the Children; and home based case therapy.[4] Tr. Vol. II at 126.

[10] On October 3, the trial court held a fact-finding hearing, and DCS presented as evidence the testimony of Venice McClendon, A.M.'s father; FCM Pulford; Officer Smith; Anderson; Lester; and FCM Fatormah. Mother presented as evidence her testimony that she has been sober since April 9, 2017, and that C.R.'s bruising was caused by a fall on a wooden toy. During her testimony, Mother admitted that C.R. had swallowed a battery shortly before DCS removed the Children on August 10.

[11] At the end of the fact-finding hearing, the trial court adjudicated L.R. and C.R. to be CHINS, but the court found that A.M. was not a CHINS and placed her in McClendon's custody. The court then held a dispositional hearing that same day. On October 30, the trial court entered findings of fact and conclusions in which the court found C.R. and L.R. to be CHINS

---

[3] The record does not disclose what "Redwood" is, but we surmise from the record that it is a treatment center.

[4] FCM Fatormah originally gave the service providers the wrong address and phone number for Mother. However, FCM Fatormah provided Mother with the necessary information to begin services on September 12 and September 15.

due to mother[']s drug use; her sale of drugs from her home where the children lived; the police being called to the house 2 days in a row in August 2017 and 2 people being arrested; the bruising on [C.R.] and [L.R.]; and the fact that [Mother] has been involved in 2 other CHINS cases.[5]

Appellant's App. Vol. II at 109. The trial court issued its dispositional order on November 1. This appeal ensued.

# Discussion and Decision

[12] Mother contends that the trial court erred when it adjudicated L.R. and C.R. to be CHINS. Our Supreme Court recently set out our standard of review:

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility. *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014). "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." *Id.* at 1287 (citation, brackets, and internal quotation marks omitted). When a trial court supplements a CHINS judgment with findings of fact and conclusions law, we apply a two-tiered standard of review. We consider, first, "whether the evidence supports the findings" and, second, "whether the findings support the judgment." *Id.* (citation omitted). We will reverse a CHINS determination only if it was clearly erroneous. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). A decision is clearly erroneous if the record facts do not support the findings or "if it applies the wrong legal standard

---

[5] In January 2011, Mother was involved with a CHINS case based on her drug use. That case was dismissed in January 2013 after A.M. was placed with McClendon. In December 2016, McClendon agreed to let A.M. live with Mother so that A.M. could get to know L.R. and C.R. In January 2017, DCS filed another CHINS petition. Mother and A.M. participated in home-based therapy, and that case was dismissed without a fact-finding hearing.

to properly found facts." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (citation omitted).

*Gr. J. v. Ind. Dep't. of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (alterations in original).

[13] Mother contends that the trial court erred when it adjudicated L.R. and C.R. as CHINS because "[t]here is no evidence that Mother was aware that any illegal drugs were in the home," because "the record does not show that the suspected heroin was in 'plain sight,'" and because "[t]he bruising [on L.R. and C.R.] is not indicative of any abuse or neglect." Appellant's Br. at 9. DCS alleged that the Children were CHINS pursuant to Indiana Code Section 31-34-1-1, which provides that a child is a child in need of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *J.B. v. Ind. Dep't. of Child. Serv. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[14] We agree with DCS that the evidence most favorable to the trial court's findings supports its conclusion that L.R. and C.R. are CHINS. During the hearing, McClendon testified that Mother had told him that "she did heroin and that . . . she used, [and] her boyfriend or fiancé [also] used. She said she had messed up and apologized. She said that she was selling drugs, said that she basically messed up." Tr. Vol. II at 61. He also testified that Mother had told him that she has used drugs "since the case has started" and that she has sold drugs since the start of this case. *Id*. at 66. McClendon further testified that he would be concerned for A.M.'s safety if she were to be in Mother's care again because "[e]very time she has ever been there, she has been hurt, she has been abused, she's been—something has happened to my daughter." *Id*. at 63.

[15] In addition, FCM Pulford testified that she would have concerns about the Children returning to Mother's care because Mother "did not produce a [drug] screen to me so I had no idea what was or was not in her system. There was unexplained bruising on the children. There was someone living in the home who had a syringe on them and I had concerns of drug use." *Id*. at 112.

[16] Officer Smith testified that he had found a substance that he believed to be heroin in a room of Mother's house, that Mother had told him that the substance was heroin, and that Mother had told him he had found the heroin in her bedroom. He further testified that he had arrested a small-time dealer at Mother's house on August 9 due to an incident "over [Mother] not paying him for . . . marijuana." *Id*. at 97. Officer Smith testified that he "[a]bsolutely" had

concerns for the Children's safety because of the presence of narcotics in the house.  *Id*. at 95.

[17]  Further, FCM Fatormah testified that Mother was participating in some of the services, but "[a]s far as Redwood, [Mother] has not been compliant with that."  *Id*. at 138.  She also testified that Mother "is not in a substance abuse assessment."  *Id*. at 139.  FCM Fatormah also testified that she believed that the Court's involvement is necessary because Mother "has failed to provide a stable and safe home for the kids free from drug use."  *Id*. at 128.  FCM Fatormah further testified that she would "absolutely" have concerns regarding the safety of the Children in Mother's care because of "[d]rug use and abuse.  Physical abuse."  *Id*.  DCS also presented Lester's testimony as evidence.  Lester testified that she has "extreme concerns" with Mother having custody of the Children because the Children "were not being nurtured."  *Id*. at 122.  In addition to the testimony DCS presented as evidence, Mother admitted during her testimony that C.R. had swallowed a battery while in her care.

[18]  The evidence most favorable to the trial court's findings shows that Mother has used drugs during this case, that there was heroin in plain sight in Mother's home while the Children were present, that Mother is not compliant with the services she requested in order to solve her problem, and that L.R. and C.R. had both sustained unexplained bruising while in Mother's care.  The evidence supports the trial court's findings that Mother's actions or inactions have seriously endangered the Children, that the Children's needs are unmet, and that those needs are unlikely to be met without State coercion.  *See In re S.D.*, 2

N.E.3d at 1287. And those findings support the trial court's judgment that L.R. and C.R. are CHINS. Mother's contentions on appeal are simply requests that we reweigh the evidence which we cannot do. *See In re D.J.*, 68 N.E.3d at 577. In light of the evidence most favorable to the judgment, we cannot say that the trial court's adjudication of L.R. and C.R. as CHINS is clearly erroneous. As such, we affirm the trial court's judgment.

[19] Affirmed.

Robb, J., and Altice, J., concur.